NOT RECOMMENDED FOR PUBLICATION
File Name: 25a0488n.06

No. 24-3960

## UNITED STATES COURT OF APPEALS
## FOR THE SIXTH CIRCUIT

BRANDOL LIM,

    Plaintiff,

ANDREW STRICKLAND; JOSHUA
STRICKLAND,

    Plaintiffs-Appellants,

v.

EDWARD HIGHTOWER; ADAM KROLL;
DANIEL A. NINIVAGGI,

    Defendants-Appellees.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

**FILED**

Oct 21, 2025

KELLY L. STEPHENS, Clerk

ON APPEAL FROM THE
UNITED STATES DISTRICT
COURT FOR THE NORTHERN
DISTRICT OF OHIO

OPINION

Before: MOORE, GRIFFIN, and NALBANDIAN, Circuit Judges.

GRIFFIN, J., delivered the opinion of the court in which NALBANDIAN, J., concurred, and MOORE, J., concurred in part. MOORE, J. (pp. 30–52), delivered a separate opinion dissenting in part.

GRIFFIN, Circuit Judge.

Lordstown Motors Corp. and Foxconn Technology Group entered into a partnership to develop and manufacture electric vehicles. Despite the consistent public praise of the partnership from Lordstown's executives, Foxconn ultimately, and unexpectedly, terminated the partnership. Without Foxconn's financial backing, Lordstown had to declare bankruptcy. Plaintiffs—shareholders who invested in Lordstown—then sued three Lordstown executives for alleged violations of the Securities Exchange Act of 1934 based on defendants' purported fraudulent misrepresentations about the state of the partnership. The district court dismissed the complaint.

On appeal, plaintiffs challenge that dismissal, as well as the district court's decisions to take judicial notice of certain documents and to deny plaintiffs leave to amend their complaint. Because plaintiffs failed to plausibly plead their fraud claims with particularity, and because the district court did not abuse its discretion in taking judicial notice or denying leave to amend, we affirm.

I.

Lordstown was founded in 2018 to develop and manufacture electric vehicles. Lordstown planned for its "flagship vehicle" to be the Endurance, an electric full-size pickup truck. In 2019, to bring this plan to fruition, Lordstown purchased "one of the largest automotive manufacturing facilities in North America." Soon thereafter, Lordstown became a publicly traded company.

Lordstown began developing the Endurance and planned to launch it for sale in 2021. But the company experienced financial challenges from supply-chain issues. So Lordstown sought out a partner to alleviate its financial concerns. In September 2021, Lordstown and Foxconn—a Taiwanese company that claims to be the world's largest electronics manufacturer—announced that they had agreed to work jointly on electric-vehicle manufacturing. The parties then executed an Agreement in Principle, in which they agreed to enter into "future agreements": (1) an Asset Purchase Agreement, where Foxconn would buy the Lordstown manufacturing plant and its employees for $230 million and purchase $50 million in shares of Lordstown's common stock; (2) a Contract Manufacturing Agreement, where Foxconn would procure parts and manufacture the Endurance for Lordstown; and (3) a Joint Venture Agreement, where the parties would form a joint venture through which they would "collaborate on the development of future electric vehicle programs."

Because Foxconn sought to establish a larger presence in the United States and it had the capital and resources to assist Lordstown's venture, the partnership appeared to be mutually

beneficial. Indeed, in a joint press release regarding the Agreement in Principle, both Foxconn and Lordstown representatives praised the agreement. Foxconn's chairman had "high expectations," believing that Lordstown and Foxconn's joint production of the Endurance would "undoubtedly thrive under [their] partnership and business model." And then-CEO of Lordstown, defendant Daniel Ninivaggi, was "excited about the prospect of joining forces with a world-class smart manufacturer like Foxconn . . . [that] would provide operational, technology, and supply chain benefits" to produce the Endurance.

After Foxconn followed through with its promise to buy $50 million worth of Lordstown common stock, Lordstown and Foxconn formally executed the intended Asset Purchase Agreement in November 2021. Lordstown disclosed that agreement in an 8-K form filed with the SEC. And in a 10-K form also filed with the SEC, Lordstown further disclosed that investing in its business was "subject to numerous risks and uncertainties," given that the agreements with Foxconn were subject to various conditions and regulatory approvals, and Lordstown's "ability to raise sufficient capital" was always a looming concern.

After the parties signed the Asset Purchase Agreement, Foxconn allegedly "began dragging its feet" in developing and executing the Contract Manufacturing and Joint Venture Agreements. Apparently in April 2022, Foxconn senior executives refused to discuss the joint venture until they had closed on the sale of the manufacturing plant. Eventually, Foxconn "relented and agreed" to enter into the joint venture. So in May 2022, the parties executed the Contract Manufacturing and Joint Venture Agreements and closed on the sale of the Lordstown plant. On the same day, in another 8-K form, Lordstown publicly disclosed these agreements and transactions.

These agreements appeared to strengthen the parties' commitment to jointly manufacture electric vehicles. The Contract Manufacturing Agreement governed Foxconn's procurement

responsibilities for the Endurance; the Joint Venture Agreement established the parties' intent to produce two other electric vehicles, the Model C and the Model E, for which Foxconn possessed, and agreed to provide to Lordstown, the designs and data. Foxconn also agreed to make a capital contribution of $55 million to the joint venture.

But starting in May 2022, plaintiffs contend that "Foxconn failed to live up to its end of the [joint venture] bargain." Foxconn allegedly stalled budgetary decisions, failed to provide Lordstown with the Model C and Model E data and designs, refused to engage during weekly board meetings, no-showed to other meetings, delayed the appointment of the joint venture's chief financial officer, and failed to make minimum monthly payments to the joint venture. These issues effectively stalled Foxconn's capital contribution to the joint venture.

Nevertheless, Lordstown moved forward with the development of the Model C and Model E. To secure the designs and data for these vehicles, defendant Edward Hightower, Lordstown's current CEO, traveled to Taiwan to meet with Foxconn's chairman. During an earnings conference call in August 2022, Hightower discussed his trip to Taiwan, noting that he attended "several meetings on how to best operationalize" the joint venture and that the venture "hope[d] to announce" its first vehicle program "in the coming months." But Lordstown still recognized that its success depended on Foxconn, its ability to raise capital, and the launch of the Endurance. Soon after, production of the Endurance commenced.

On October 14, 2022, Foxconn still had not provided its capital contribution to the joint venture, so Lordstown sent Foxconn a letter claiming Foxconn had breached the Joint Venture and Contract Manufacturing Agreements. In response, Foxconn "expressed its interest in restructuring the joint venture relationship" and proposed that Foxconn Ventures Pte. Ltd. ("FVP"), an entity partially owned by Foxconn, would increase its ownership in Lordstown. Lordstown agreed to

"move away from" the Joint Venture Agreement and enter into a "new direct investment agreement with FVP."

After several meetings, the parties executed the Investment Agreement on November 7, 2022. Under the Investment Agreement, FVP would purchase $70 million of Lordstown common stock and up to $100 million in preferred stock. This stock purchase meant that Foxconn ultimately "tripled its investment" in Lordstown.

The same day, Lordstown publicly disclosed in an 8-K form that it had entered into the Investment Agreement and briefly described the agreement's terms. Although the Investment Agreement terminated the Joint Venture Agreement, it also reiterated Foxconn's "continued intent" to "utilize [Lordstown] as [its] preferred North American vehicle development partner." Additionally, in a press release titled "Lordstown Motors and Foxconn Broaden Strategic Partnership," Hightower commented that Lordstown and Foxconn had "worked collaboratively" over the last year "to bring the Endurance into commercial production, despite numerous external challenges." He claimed that the Investment Agreement would allow the parties to bring electric vehicles "to market faster and more efficiently." And Ninivaggi described the Investment Agreement as a "deep collaboration" with Foxconn that "offer[ed] tremendous opportunities to meet our mutual ambition to accelerate [electric vehicle] adoption globally."

The day after the parties executed the Investment Agreement, Lordstown issued another press release characterizing Foxconn's additional investments in Lordstown as "a strong sign of confidence in our team's product development and engineering capabilities [that] will help accelerate the [electric vehicle] ambitions of both companies." Further, Hightower noted in the press release that although the parties had "more work to do," Foxconn's additional investment would help Lordstown "get the vehicle in the hands of our customers." And in a conference call

that same day, Hightower and defendant Adam Kroll, Lordstown's CFO, continued to praise the Investment Agreement, calling it a "capital injection" into Lordstown with a "better, simpler, easier structure" than the joint venture.

From December 2022 to March 2023, Lordstown and Foxconn appeared to work collaboratively. They produced multiple Endurances, their executives had meetings, and Lordstown delivered the first set of the electric-vehicle program deliverables under the Investment Agreement. A January 2023 8-K form filed by Lordstown, press releases, and Lordstown's public statements corroborate such collaboration.

On March 7, 2023, Lordstown's common stock dropped below NASDAQ's $1.00 per share threshold. NASDAQ notified Lordstown on April 19, 2023, that it had 180 days to return the stock price to above the threshold or face de-listing. In response, Lordstown proposed a reverse stock split to its investors.

But Foxconn discovered NASDAQ's notice, and on April 21, 2023, FVP sent Lordstown a notice of default under the Investment Agreement. If Lordstown failed to cure the default—i.e., if it failed to raise its common stock price—Foxconn would terminate the Investment Agreement. Four days later, Lordstown responded and sought FVP's retraction of the default letter, disputing that it was in default and that FVP could terminate the Investment Agreement. FVP never responded to Lordstown's letter, and on May 1, 2023, Lordstown publicly disclosed in an 8-K form that Foxconn had effectively terminated the Investment Agreement.

Even after Lordstown successfully executed the reverse stock split, it was clear that Foxconn would no longer provide necessary funding to Lordstown. In June 2023, in an 8-K form signed by Kroll, Lordstown claimed that Foxconn had breached the Investment Agreement and engaged in a "pattern of bad faith [that] caused material and irreparable harm to [Lordstown]."

Later that month, Lordstown filed for Chapter 11 bankruptcy, as well as an adversary complaint in the bankruptcy court against Foxconn and its affiliates alleging fraud and breach of contract.

In hindsight, Lordstown now claims that Foxconn intended to breach the Investment Agreement all along as part of its "scheme to starve [Lordstown] and destroy its business." Lordstown asserts that Foxconn obtained its assets for a "fraction" of their replacement cost and that it would not have sold its manufacturing plant to Foxconn had it known their relationship would ultimately deteriorate. "Rather than embracing Lordstown as [Foxconn's] partner," Lordstown claims that Foxconn "maliciously" schemed to obtain the plant and Lordstown's employees so that Foxconn could manufacture its own electric vehicles and sell them all over the world.

Lordstown shareholders take a different position, claiming that defendants Hightower, Kroll, and Ninivaggi knew all along that the agreements with Foxconn were doomed and thus commenced this purported class action, alleging violations of Section 10(b), Rule 10b–5, and Section 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq*. The operative complaint alleges that from August 4, 2022 to June 26, 2023, defendants made fraudulent misrepresentations about the state of Lordstown and Foxconn's partnership, causing plaintiffs to make bad investments in the company. After plaintiffs amended their complaint, defendants moved the district court to dismiss the operative complaint and take judicial notice of various documents. In their response to the motion to dismiss, plaintiffs included a perfunctory request for the district court to grant them leave to amend their claims again, if the court was inclined to grant the motion to dismiss. The district court granted defendants' motions to take judicial notice and to dismiss, did not discuss plaintiffs' request for leave to amend, and entered judgment in favor of defendants. Plaintiffs timely appealed.

II.

As a preliminary matter, when deciding Rule 12(b)(6) motions to dismiss, courts ordinarily consider only the four corners of the complaint; however, they may also take judicial notice to consider other materials. *Tellabs, Inc. v. Makor Issues & Rts. Ltd.*, 551 U.S. 308, 322 (2007). Consideration of additional materials is essential in securities-fraud cases given the heightened pleading standards for fraud cases under the Federal Rules of Civil Procedure and under the Private Securities Litigation Reform Act (PSLRA). *See id.* at 322–23. Federal Rule of Evidence 201(b) allows courts to take judicial notice of "a fact that is not subject to reasonable dispute because it . . . is generally known . . . or . . . can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned." Fed. R. Evid. 201(b); *see also New England Health Care Emps. Pension Fund v. Ernst & Young, LLP*, 336 F.3d 495, 501 (6th Cir. 2003) ("A court that is ruling on a Rule 12(b)(6) motion may consider materials in addition to the complaint if such materials are public records or are otherwise appropriate for the taking of judicial notice."). We review a district court's decision to take judicial notice of additional materials for an abuse of discretion. *Elec. Merch. Sys. LLC v. Gaal*, 58 F.4th 877, 883 (6th Cir. 2023).

Plaintiffs appeal the district court's taking of judicial notice of three categories of documents: (1) certain public statements by Foxconn; (2) two 8-K forms filed by Lordstown disclosing the Asset Purchase, Contract Manufacturing, and Joint Venture Agreements; and (3) three Form 4s disclosing some of defendants' stock transactions in Lordstown. Plaintiffs' judicial-notice arguments are unavailing.

*Foxconn's Public Statements*. The district court first took judicial notice of certain Foxconn public statements, including excerpts from presentation decks on quarterly financial results, transcripts from calls, a press release, and Foxconn's 2021 annual report. The court did so

because these statements revealed the totality of information Foxconn communicated to defendants and how Foxconn positively portrayed the partnership to the public.

On appeal, plaintiffs merely dispute the relevance of these documents, arguing that they do not show defendants' perception of the partnership, as opposed to Foxconn's perception. Not so. Given that these documents portray Foxconn's characterization of the partnership, they are plainly relevant to defendants' knowledge of it and thus whether they acted with scienter, i.e., the requisite mental state for a securities-fraud claim. After all, defendants (the former CEO, the current CEO, and the CFO) were integral to establishing a partnership with Foxconn and knowing about its operations. To say that they were unaware of Foxconn's public statements taxes credulity. Not to mention, like the district court highlighted, plaintiffs do not dispute the documents' authenticity or public availability. Therefore, the district court did not abuse its discretion in taking judicial notice of Foxconn's public statements. *See Tellabs*, 551 U.S. at 322–23 ("[C]ourts must consider the complaint in its entirety, as well as other sources courts ordinarily examine when ruling on Rule 12(b)(6) motions to dismiss, in particular, documents incorporated into the complaint by reference, and matters of which a court may take judicial notice. The inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter . . . ."); *In re Unumprovident Corp. Sec. Litig.*, 396 F. Supp. 2d 858, 876 (E.D. Tenn. 2005) (collecting cases where courts "have taken judicial notice of information that was publicly available to reasonable investors at the time the defendant made the allegedly false statements" in securities-fraud actions); *In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043, 1062 (C.D. Cal. 2012) ("Taking judicial notice of news reports and press releases is appropriate for show[ing] 'that the market was aware of the information contained in news articles . . . .'" (quoting *Heliotrope Gen., Inc. v. Ford Motor Co.*, 189 F.3d 971, 981 n.18 (9th Cir. 1999))).

*8-K Forms.* Next, plaintiffs challenge the district court's taking of judicial notice of Lordstown's 8-K forms that disclosed and attached in full the Asset Purchase Agreement, Contract Manufacturing Agreement, and Joint Venture Agreement. The district court took judicial notice of these forms because they are "relevant in determining whether Defendants misled the public given the totality of the available information."

Again, the district court did not abuse its discretion in taking judicial notice of these forms. Because SEC filings are typically "not subject to reasonable dispute," Fed. R. Evid. 201(b), courts routinely take judicial notice of such filings, *see, e.g.*, *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 47 (2d Cir. 1991) ("[W]hen a district court decides a motion to dismiss a complaint alleging securities fraud, it may review and consider public disclosure documents required by law to be and which actually have been filed with the SEC, particularly where plaintiff has been put on notice by defendant's proffer of these public documents."); *Dasfortus Technologies, LLC v. Precision Prods. Mfg. Co., Ltd (Hong Kong)*, 2011 WL 1875165, at *1 n.3 (M.D. Tenn. May 17, 2011) (taking judicial notice of a Form 8-K under Fed. R. Evid. 201(b) because the form was "not subject to reasonable dispute"); *N. Port Firefighters' Pension-Loc. Option Plan v. Fushi Copperweld, Inc.*, 929 F. Supp. 2d 740, 773–74 (M.D. Tenn. 2013) (noting that courts can take judicial notice of SEC filings in securities-fraud actions because such information is "publicly available to reasonable investors at the time the defendant made the allegedly false statements" (citation omitted)). While plaintiffs argue that these forms pre-date the class period and are therefore irrelevant, much of the complaint details events that occurred before the class period—events that are relevant to defendants' perception of the partnership. And plaintiffs have provided no authority indicating that the district court abused its discretion. Thus, the district court properly took judicial notice of these public SEC filings.

*Form 4s.* The district court also took judicial notice of three Form 4s disclosing Hightower's and Kroll's Lordstown stock transactions during the class period. The court did so because it found that these documents contradicted plaintiffs' claims of scienter.

Once again, the district court did not abuse its discretion. Plaintiffs specifically rely on these transactions to allege scienter, inferring that defendants disposed of Lordstown common stock in an act of insider trading. These SEC filings, which are incorporated by reference in plaintiff's amended complaint and not subject to reasonable dispute, are plainly relevant to the scienter analysis. *See Tellabs*, 551 U.S. at 322–23; *Cortec Indus.*, 949 F.2d at 47; *Plymouth Cnty. Ret. Ass'n v. ViewRay, Inc.*, 556 F. Supp. 3d 772, 784, 800 (N.D. Ohio 2021) (taking judicial notice of Form 4s for scienter analysis).

Moreover, the Form 4s contradict the complaint's allegations of insider trading. *See Nolan v. Detroit Edison Co.*, 991 F.3d 697, 707 (6th Cir. 2021) ("When a document contradicts allegations in the complaint, rendering them implausible, the exhibit trumps the allegations." (citation modified)); *see also In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 466 (6th Cir. 2014) (explaining that courts should take judicial notice of accurate documents that contradict the complaint because otherwise, "complaints that quoted only selected and misleading portions of such documents could not be dismissed under Rule 12(b)(6) even though they would be doomed to failure" (citation omitted)). Contrary to the allegations that defendants sold their stock because they knew the Foxconn partnership was failing, the Form 4s indicate that Kroll and Hightower converted some of their restricted stock to common stock to satisfy their tax withholding obligations, which "does not represent a sale." Further, the forms also show that Hightower and Kroll acquired Lordstown stock. The district court thus did not abuse its discretion.

In sum, because the district court appropriately took judicial notice of the challenged documents that defendants submitted with their motion to dismiss (and plaintiffs did not dispute the consideration of some additional documents), we may consider all the documents the district court took judicial notice of when reviewing the district court's dismissal of plaintiffs' complaint.

III.

We review de novo a district court's dismissal of a case under Federal Rule of Civil Procedure 12(b)(6). *In re Omnicare*, 769 F.3d at 469. To survive a Rule 12(b)(6) motion to dismiss, plaintiffs must allege facts that, if accepted as true, are sufficient "to raise a right to relief above the speculative level" and to state a "claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555, 570 (2007). A claim is plausible if the court can "draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Along with abiding by the "*Twombly/Iqbal* framework" for evaluating Rule 12(b)(6) motions, *see Greer v. Strange Honey Farm, LLC*, 114 F.4th 605, 614 (6th Cir. 2024), plaintiffs' complaint, which alleges securities-fraud claims, must also meet the stringent pleading requirements of Federal Rule of Civil Procedure 9(b), *see Ind. State Dist. Council of Laborers & Hod Carriers Pension & Welfare Fund v. Omnicare, Inc.*, 583 F.3d 935, 942–43 (6th Cir. 2009). Rule 9(b) requires plaintiffs to plead "with particularity the circumstances constituting fraud or mistake." Fed. R. Civ. P. 9(b). Generally, that standard requires plaintiffs to detail the "who, what, when, where, and how of the alleged fraud." *Sanderson v. HCA–The Healthcare Co.*, 447 F.3d 873, 877 (6th Cir. 2006) (citation modified).

Ratcheting up the general pleading standards another notch, the complaint must also satisfy the "elephant-sized boulder" known as the "heightened pleading" requirements of the PSLRA,

15 U.S.C. § 78u-4(b)(2)(A). *In re Omnicare*, 769 F.3d at 461; *see also Stoneridge Inv. Partners, LLC v. Sci.-Atlanta*, 552 U.S. 148, 165 (2008). Under the PSLRA, a complaint alleging securities-fraud claims must, for each actionable statement, allege "with particularity facts giving rise to a strong inference that the defendant acted with the required state of mind," i.e., scienter. 15 U.S.C. § 78u-4(b)(2)(A).

### IV.

Plaintiffs' claims arise under the Securities Exchange Act of 1934, 15 U.S.C. § 78a *et seq*. Their first claim alleges violations of Section 10(b), 15 U.S.C. § 78j(b), and SEC Rule 10b–5, 17 C.F.R. § 240.10b–5, which generally make it unlawful to use manipulation or deception in connection with a securities transaction. *See Stoneridge*, 552 U.S. at 156–57; *see also Basic Inc. v. Levinson*, 485 U.S. 224, 230 (1988) (defining the "fundamental purpose" of the Exchange Act as "implementing a philosophy of full disclosure" (citation modified)). Specifically, individuals cannot "make any untrue statement of a material fact or . . . omit to state a material fact" when purchasing or selling securities. *Stoneridge*, 552 U.S. at 156–57 (quoting 17 C.F.R. § 240.10b–5). Among other elements, to state a claim under Section 10(b) and Rule 10b–5, a plaintiff must plausibly plead that the defendant (1) made material misrepresentations or omissions and (2) acted with scienter. *Matrixx Initiatives, Inc. v. Siracusano*, 563 U.S. 27, 37–38 (2011). Plaintiffs failed to meet the stringent pleading requirements of Rule 9(b) and the PSLRA for both elements.

### A.

"Successfully pleading an actionable material misrepresentation or omission requires a plaintiff to allege facts demonstrating two things: (1) that a defendant made a statement or omission that was false or misleading; and (2) that this statement or omission concerned a material fact." *In re Omnicare*, 769 F.3d at 470. When assessing alleged misrepresentations or omissions,

we do not "focus on the overall impression" of the statements. *Bondali v. Yum! Brands, Inc.*, 620 F. App'x 483, 492 (6th Cir. 2015) (emphasis removed). Instead, to survive dismissal, plaintiffs must plead enough facts showing that each "particular statement . . . conveyed a false or misleading impression." *Id.* (citation modified).

1.

For an affirmative statement or an omission to satisfy the first element of a Section 10(b) claim, it must first be "misleading or false." *In re Omnicare*, 769 F.3d at 470–71; *Ind. State Dist.*, 583 F.3d at 943. Regarding omissions, when a company's representative "fail[s] to disclose information when it had a duty to do so" and that failure renders a "prior statement misleading or false," the omission may violate Section 10(b). *In re Omnicare*, 769 F.3d at 471. In other words, because companies and their representatives have duties to disclose certain information, *see Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 572 (6th Cir. 2008); *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 669 (6th Cir. 2005), they cannot avoid liability by choosing not to speak when they were obligated to say something, *Ind. State Dist.*, 583 F.3d at 943.

Whether a company has a duty to disclose turns on the distinction between "hard" and "soft" information. *Zaluski*, 527 F.3d at 572. Hard information, which companies must disclose, *id.*, "is typically historical information or other factual information that is objectively verifiable," *In re Sofamor Danek Grp., Inc.*, 123 F.3d 394, 401 (6th Cir. 1997) (citation modified). Conversely, "soft information" usually "includes predictions and matters of opinion," *id.* (citation modified), and must be disclosed "only if it is virtually as certain as hard facts," *Zaluski*, 527 F.3d at 572 (citation omitted). That said, when a company voluntarily discloses soft information, "its disclosure must be full and fair." *Helwig v. Vencor, Inc.*, 251 F.3d 540, 564 (6th Cir. 2001) (en

banc) (citation omitted), *abrogated on other grounds by*, *Tellabs*, 551 U.S. at 308. If the disclosure of such information is not full and fair and is "made with knowledge of its falsity," the company and speaker may be subject to liability. *In re Omnicare*, 769 F.3d at 470 (citation omitted).

Regardless of whether the disclosed information is hard or soft, the PSLRA's safe-harbor provision "generally protects companies from liability when they issue future forecasts." *Zaluski*, 527 F.3d at 572; *see also* 15 U.S.C. § 78u–5(c)(1). "[T]his provision excuses liability for defendants' projections, statements of plans and objectives, and estimates of future economic performance." *Helwig*, 251 F.3d at 547–48. Still, companies cannot make forward-looking statements "in a misleading manner." *Zaluski*, 527 F.3d at 572.

In light of Foxconn's alleged actions harming its partnership with Lordstown—e.g., delaying the execution of the Contract Manufacturing and Joint Venture Agreements, refusing to discuss the joint venture until the parties closed the sale of the Lordstown manufacturing plant, failing to provide the Model C and Model E designs and data, stalling budgetary decisions, leaving the joint venture, and terminating the Investment Agreement—plaintiffs claim that defendants' statements positively portraying the partnership were false and misleading. Not so.

Start with the alleged misrepresentations. Like the district court held, many of these statements are not actionable under the Exchange Act because they are not false or misleading. For example, take Hightower's purportedly misleading statements about his trip to Taiwan: "[W]e had several meetings on how to best operationalize the [joint venture] and leverage our concept through launch vehicle development capabilities in concert with the Foxconn EV ecosystem. We also had several discussions about the first vehicle program of the [joint venture], which we hope to announce in the coming months." Plaintiffs concede that Hightower traveled to Taiwan and met with Foxconn executives. And the complaint does not contain particular facts showing that

Hightower's characterization of the meetings was false—indeed, it is implausible that Hightower traveled all the way to Taiwan, met with Foxconn executives, and did not discuss the joint venture or their electric-vehicle program.

Next, consider defendants' alleged misleading statements acknowledging Foxconn's collaboration, investments, and role in the partnership. These statements are not misleading, given that the complaint similarly details Foxconn's hundreds of millions of dollars in investments, execution of multiple agreements, successful manufacturing of the Endurance, and general development of other electric-vehicle programs with Lordstown. Although the partnership ultimately failed, that failure does not mean that the parties' entire relationship was fraudulent such that anytime defendants spoke positively about the partnership they engaged in misrepresentation. And even if Foxconn intended to "sabotage[]" Lordstown, defendants reasonably perceived Foxconn's actions (e.g., investments, negotiations, agreements) to indicate otherwise. Thus, defendants' positive characterization of the partnership was not false or misleading.

Moreover, many of the alleged misrepresentations constitute inactionable soft information (a prediction or matter of opinion) that was fully and fairly disclosed or forward-looking statements that were not disclosed in a misleading manner. Accordingly, defendants' statements discussing the partnership's goals, intentions, plans, or hopes are not actionable under the Act's safe-harbor provision. *See* 15 U.S.C. § 78u–5(c)(1)(A)(i); *Miller v. Champion Enters. Inc.*, 346 F.3d 660, 672 (6th Cir. 2003). These statements do not concern facts that can be verified. *See Dougherty v. Esperion Therapeutics, Inc.*, 905 F.3d 971, 983 (6th Cir. 2018) ("The critical inquiry in determining whether a statement is forward-looking is whether its veracity can be determined at the time the statement is made." (citation omitted)). And throughout the class period, defendants also made cautionary statements about the future of the partnership, noting that it was subject to

certain "risk factors," such as Foxconn's capital investment. *See Miller*, 346 F.3d at 672 (explaining that forward-looking statements must be accompanied by "meaningful cautionary statements"). Accordingly, defendants' public predictions and hopes for the partnership do not satisfy the first element of a Section 10(b) claim.

As for defendants' alleged omissions, plaintiffs vaguely assert that defendants should have disclosed certain facts that "would have been highly material to investors." Such supposed "facts" include that Foxconn "stonewalled Lordstown and dragged its feet" in developing the joint venture; was slow to respond and failed to respond to certain commitments; "stymied [Lordstown's] attempts to move forward with the partnership"; failed to "meaningfully engage" with Lordstown during meetings; "mov[ed] goal posts on the development" of products; "continuously misled Lordstown about [Foxconn's] ability or willingness to support the Endurance"; and "consistently failed to honor its agreements." Many of these allegations, however, concern soft information—matters of opinion—that defendants did not have a duty to disclose. *See In re Sofamor*, 123 F.3d at 401. And all these allegations fail to plead with particularity the "who, what, when, where, and how of the alleged fraud." *Sanderson*, 447 F.3d at 877 (citation modified). Indeed, the complaint fails to specifically plead what "prior statement[s]" the alleged omissions rendered "misleading or false." *See In re Omnicare*, 769 F.3d at 471; *see also Macquarie Infrastructure Corp. v. Moab Partners, L.P.*, 601 U.S. 257, 264 (2024). These purported "omissions" are therefore not actionable either.

Even so, plaintiffs appear to allege two hard facts that defendants failed to disclose. First, the CEO of Foxtron (an affiliate of Foxconn) allegedly refused to meet with Hightower during his Taiwan trip, which plaintiffs claim is significant because Foxtron controlled the Model C and Model E designs. But Hightower's characterization of the Taiwan trip did not detail any plans

involving the Model C and Model E vehicles, so any relationship with Foxtron's CEO is irrelevant, and certainly not contrary to Hightower's public statements about the trip. *See Macquarie Infrastructure Corp.*, 601 U.S. at 264 (requiring the "disclosure of [only] information necessary to ensure that statements already made are clear and complete"). Indeed, Hightower's public statements about the trip concerned his meetings with Foxconn's CEO and how they planned to "best operationalize" the joint venture. While Hightower generally characterized the Taiwan meetings as successful, the complaint does not plead facts indicating otherwise, nor does it plead facts indicating that the failure to disclose that Hightower did not meet with Foxtron's CEO was so critical as to render Hightower's statements about the meeting false or misleading.

Second, plaintiffs complain that defendants failed to disclose that Lordstown sent Foxconn a letter in October 2022, accusing Foxconn of breaching the Joint Venture Agreement and Contract Manufacturing Agreement. True, defendants did not disclose to the public that Lordstown believed, at the time, that Foxconn breached these agreements. But at that point, disclosure was not necessary—that letter precipitated negotiations with Foxconn that quickly resulted in a new agreement. Indeed, less than a month after Lordstown sent the letter, the parties mutually abandoned the Joint Venture and Contract Manufacturing Agreements and began to discuss the more favorable Investment Agreement, which included Foxconn's commitment to invest substantial funds into the partnership. Other than Lordstown's letter, defendants and Foxconn did not entertain any further discussion about the original agreements; they instead "moved on" to negotiating a new agreement. And only upon the execution of the Investment Agreement did "the outcome of the negotiations [become] as certain as hard facts," *Freeburg v. Wolf*, 42 F. App'x 715, 716 (6th Cir. 2002) (per curiam) (citation modified), giving rise to defendants' duty to disclose the statuses of the business relationship and Investment Agreement, which Lordstown did the same

day the parties signed the Investment Agreement. While, at first blush, Lordstown's failure to disclose its belief that Foxconn breached the original agreements appears to be an omission of a hard fact, until the parties entered into the new agreement, the status of their partnership was not "virtually as certain as hard facts." *See Zaluski*, 527 F.3d at 572 (citation omitted). Accordingly, defendants did not omit any information about the termination of the Joint Venture and Contract Manufacturing Agreements that they had to disclose.

Disagreeing, plaintiffs argue that, given Foxconn's actions purportedly harming the partnership, defendants knew their public statements portrayed the partnership in a falsely positive light and hid the truth. But even if the entire partnership was indeed a scam to benefit Foxconn, the complaint does not plead facts showing that defendants knew of that scam so to render their public characterizations of the partnership false or misleading. Indeed, "[c]orporate officials need not be clairvoyant; they are only responsible for revealing those material facts reasonably available to them. Thus, allegations that defendants should have anticipated future events and made certain disclosures earlier than they actually did do not suffice to make out a claim of securities fraud." *Novak v. Kasaks*, 216 F.3d 300, 309 (2d Cir. 2000) (internal citation omitted). Plaintiffs' case is a classic example of "fraud by hindsight," which generally does not support a claim of securities fraud. *See id.*

For these reasons, plaintiffs have failed to plead with particularity that defendants' affirmative statements and omissions were false or misleading.

2.

In addition to being false or misleading, the statements or omissions must be material to investors to establish the first element of a Section 10(b) and Rule 10b–5 claim. Materiality, which we analyze under a "fact-intensive test" on a case-by-case basis, *Helwig*, 251 F.3d at 555 (citing

*Basic Inc.*, 485 U.S. at 240), "depends on the significance the reasonable investor would place on the withheld or misrepresented information," *Basic Inc.*, 485 U.S. at 240. We thus ask, "would the information, had it been presented accurately, have significantly altered the total mix of information made available?" *City of Monroe*, 399 F.3d at 669 (citation modified). Or in other words, "if there is a substantial likelihood that a reasonable shareholder would consider [the information] important in deciding how to vote," then it is material. *In re Omnicare*, 769 F.3d at 472 (citation omitted). When determining the materiality of a statement, we must consider it in its "full context." *Id.*

Statements that are "vague, soft, puffing statements or obvious hyperbole upon which a reasonable investor would not rely" are immaterial. *Id.* (citation omitted). Indeed, "liability does not attach to mere corporate puffery or statements of corporate optimism." *Ind. State Dist.*, 583 F.3d at 943. That is because "immaterial puffery"—such as statements describing the company or its products "in terms of 'quality' or 'best'"—is "too squishy, too untethered to be anything measurable, to communicate anything that a reasonable person would deem important to a securities investment decision." *City of Monroe*, 399 F.3d at 671.

Here, defendants' alleged misstatements constitute immaterial puffery or corporate optimism. Defendants repeatedly expressed their desire to "develop a broad strategic partnership" with Foxconn, bring their electronic-vehicle-program plans to fruition, work collaboratively, and expand the partnership. And they praised Foxconn for investing in Lordstown and choosing Lordstown as its "preferred North American vehicle development partner." Investors would likely not rely on this vague puffery when deciding whether to invest or how to vote. *See Ind. State Dist.*, 583 F.3d at 943; *In re Omnicare*, 769 F.3d at 472. For example, statements describing the Investment Agreement as "a better, simpler, easier structure" than the Joint Venture Agreement,

or statements describing Foxconn as "a world-class contract manufacturing partner," "are too squishy" to be important to a securities-investment decision. *City of Monroe*, 399 F.3d at 671; *see also Zaluski*, 527 F.3d at 573. Considered in full context, these statements merely expressed defendants' hopes for the future of the partnership.

Because defendants' alleged misrepresentations were mere puffery or corporate optimism, they are immaterial and, therefore, not actionable under the Exchange Act.

3.

Accordingly, plaintiffs failed to plead with particularity that defendants made materially false or misleading misrepresentations or omissions.

B.

Even if plaintiffs had appropriately pleaded that defendants' alleged misrepresentations and omissions were material and false or misleading, their Section 10(b) claim would still fail due to their failure to satisfy the PSLRA's heightened scienter pleading requirements. To plausibly plead scienter, "plaintiffs must plead facts showing that defendants had a 'mental state embracing intent to deceive, manipulate or defraud.'" *In re Omnicare*, 769 F.3d at 472 (citation omitted). "In the securities-fraud context, scienter includes a knowing and deliberate intent to manipulate, deceive, or defraud" and "recklessness." *Doshi v. Gen. Cable Corp.*, 823 F.3d 1032, 1039 (6th Cir. 2016) (citation omitted). "Recklessness requires more than negligence"—it is "akin to conscious disregard" and is "highly unreasonable conduct which is an extreme departure from the standards of ordinary care." *Id.* (citations omitted). But when the alleged misrepresentation or omission concerns soft information, plaintiffs must plead more than recklessness; they must "plead facts showing that the defendants knowingly misrepresented or omitted facts to deceive, manipulate, or defraud the public." *In re Omnicare*, 769 F.3d at 472.

Because of the PSLRA's heightened pleading requirements, "[t]he well-pleaded facts must give rise not merely to an inference of scienter, but to a *strong* inference of scienter." *La. Sch. Emps.' Ret. Sys. v. Ernst & Young, LLP*, 622 F.3d 471, 479 (6th Cir. 2010). The scienter analysis is a "holistic[]" inquiry, where we consider "*all* of the facts alleged, taken collectively." *See Tellabs*, 551 U.S. at 323, 326; *see also In re Omnicare*, 769 F.3d at 473. At the motion-to-dismiss stage, a complaint will survive "only if 'a reasonable person would deem the inference of scienter cogent and *at least as compelling* as any opposing inference one could draw from the facts alleged.'" *La. Sch. Emps.' Ret. Sys.*, 622 F.3d at 479 (quoting *Tellabs*, 551 U.S. at 324).

The factors announced in *Helwig* aid our scienter analysis. *In re Omnicare*, 769 F.3d at 473 (quoting *Helwig*, 251 F.3d at 552). Relevant here, these factors include "insider trading at a suspicious time or in an unusual amount"; "divergence between internal reports and external statements on the same subject"; "closeness in time of an allegedly fraudulent statement or omission and the later disclosure of inconsistent information"; and "disregard of the most current factual information before making statements." *Id.* Though no factor is dispositive, "[t]he more of these factors that are present, the stronger the inference that the defendant made his statement with the requisite state of mind." *Id.*

Plaintiffs claim that defendants acted with scienter because they knew, or were reckless in not knowing, that Foxconn "was not a viable partner and was not acting in good faith." Because of defendants' alleged "widespread knowledge within [Lordstown] that Foxconn was going to sabotage the relationship," plaintiffs claim that we can "infer[]" defendants' knowledge or reckless disregard that the partnership would ultimately fail. But the pleaded facts do not give rise to a strong inference of scienter.

The complaint (and Lordstown's bankruptcy adversary complaint attached to it) pleaded that Lordstown and defendants were "continuously misled" about Foxconn's "ability or willingness" to support the partnership. Yet, defendants did not foresee that the partnership would ultimately fail, especially when Foxconn was pumping millions of dollars into it. Instead, defendants repeatedly thanked Foxconn for its capital contributions—the only thing that kept the partnership alive for as long as it existed. Viewed holistically, the complaint offers no inference that defendants knew or should have known that the partnership would fail; rather, the allegations indicate that Foxconn secretly sabotaged and unexpectedly ended the partnership. Therefore, plaintiffs fail to plead facts showing defendants' recklessness—let alone their knowing misrepresentation with the intent to defraud (when soft information is at issue)—when making public statements about the partnership. And, as explained next, the relied-upon *Helwig* factors confirm this conclusion.

*Insider Trading*. Plaintiffs argue that Kroll's and Hightower's knowledge of the poor state of the partnership can be inferred through their "disposal" of Lordstown stock in October and November 2022. But as the Form 4s disclosing these transactions show, and as the district court highlighted, Kroll and Hightower merely converted restricted stock units into common stock units. Contrary to plaintiffs' assertions of stock "disposal," this transaction "does not represent a sale." The Form 4s also show that Hightower and Kroll *acquired* common stock during this period. Thus, the true nature of defendants' alleged "disposals" and their acquisitions of stock undermine plaintiffs' claims of insider trading. *See In re Level 3 Commc'ns, Inc. Sec. Litig.*, 667 F.3d 1331, 1346–47 (10th Cir. 2012); *I.B.E.W. v. Ltd. Brands, Inc.*, 788 F. Supp. 2d 609, 631 (S.D. Ohio 2011).

While plaintiffs claim the district court erred because it should have "defer[red] the evaluation of the nature of a stock sale until after discovery," they ignore that, at the motion-to-dismiss stage, we can consider documents that contradict the complaint to ensure that cases "doomed [for] failure" do not proceed. *See In re Omnicare*, 769 F.3d at 466; *Nolan*, 991 F.3d at 707. Because the Form 4s render plaintiffs' allegations of insider trading implausible, this *Helwig* factor does not favor scienter.

*Defendants' Knowledge of the Partnership vs. Their Public Statements.* Plaintiffs base much of their scienter argument on inferences. They claim that, given defendants' positions within Lordstown, they must have known that Foxconn was scheming Lordstown and planned to end the partnership. Thus, defendants' public statements touting the partnership impliedly show scienter.

Defendants' high-level positions in Lordstown do not mean they were aware of Foxconn's "bad faith" or could predict that the partnership would fail. Indeed, we cannot infer "fraudulent intent" "merely from the [i]ndividual [d]efendants' positions in the Company and alleged access to information." *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 688 (6th Cir. 2004), *abrogated on other grounds by*, *Frank v. Dana Corp.*, 646 F.3d 954 (6th Cir. 2011); *see also Pittman v. Unum Grp.*, 861 F. App'x 51, 55 (6th Cir. 2021) ("[T]he fact that executives are intimately familiar with a core component of their business does little to suggest fraudulent intent."). And, in any event, given Foxconn's continued commitment to and investment in the partnership until its ultimate decision to terminate the Investment Agreement, the complaint does not plausibly plead that defendants' internal knowledge diverged from their external statements thanking Foxconn for its partnership.

Plaintiffs also allege that defendants disregarded "red flags" about the partnership—e.g., Foxconn's failure to provide the Model C and Model E designs, the parties' abandonment of the

joint venture, and Foxconn's slow responses or failures to respond to certain communications—before making public statements positively characterizing it. At most, this conduct amounted to mere negligence, not recklessness. *See PR Diamonds*, 364 F.3d at 686–87. True, the partnership was not without its "external challenges," as Hightower acknowledged. But the parties attempted to overcome these hiccups by evolving their relationship with new agreements, new electric-vehicle programs, and new investment opportunities. As the district court aptly put it, "[i]t is not uncommon for businesses to restructure agreements that are unproductive." The parties' decision to distance themselves from the fruitless joint venture was not so much a "red flag" that defendants ignored but rather an attempt to keep the partnership moving forward. And the fact that doing so may have been a "bad (in hindsight) business judgment[]," given that Foxconn eventually terminated the resulting Investment Agreement, "such actions fall short of scienter in the context of securities fraud." *Ashland, Inc. v. Oppenheimer & Co., Inc.*, 648 F.3d 461, 470 (6th Cir. 2011).

Further, plaintiffs' attempted reliance on their confidential witnesses' statements does not move the needle. The complaint cites the opinions and observations of three confidential witnesses who worked at Lordstown to support the claim that "the poor relationship between Lordstown and Foxconn was known internally at Lordstown." For example, Confidential Witness 1 was "of the personal belief that Foxconn intended to 'let Lordstown fail'" and "put roadblocks in the way" of the partnership. And even though Lordstown employees were "not told explicitly that Foxconn wanted Lordstown to fail," this witness believed that Lordstown executives, including defendants, must have also known this plan based on Foxconn's alleged "instructions for plan employees not to help Lordstown." Moreover, Confidential Witnesses 2 and 3 opined about the "lack of funding from Foxconn" in late 2022 and early 2023 and consequent failure to meet "milestones." These

observations, plaintiffs contend, establish the divergence between internal reports and defendants' external statements.

But these confidential witnesses' vague statements—all made in hindsight—about their personal beliefs do not support an inference of scienter. *See Ricker v. Zoo Ent., Inc.*, 534 F. App'x 495, 496 n.2 (6th Cir. 2013) (noting that "conclusory or vague allegations" from anonymous sources "do not deserve much weight" in the scienter analysis); *Konkol v. Diebold, Inc.*, 590 F.3d 390, 399 (6th Cir. 2009) (same), *abrogated on other grounds by*, *Matrixx Initiatives*, 563 U.S. at 27; *see also Doshi*, 823 F.3d at 1037 n.2 (explaining that courts may rely on anonymous sources in securities-fraud cases only "if [the plaintiffs] plead facts with sufficient particularity to support the probability that a person in the confidential witness's position would possess the information alleged"). Plaintiffs fail to plead how the confidential witnesses' beliefs about the partnership were the sort of "internal report[]" that defendants would have relied on. *See Helwig*, 251 F.3d at 552. Not to mention, plaintiffs do not allege that the confidential witnesses ever informed defendants of these beliefs.

Accordingly, these *Helwig* factors do not weigh toward scienter.

*Temporal Proximity.* Finally, plaintiffs contend that the temporal proximity between defendants' March 2023 statements and Foxconn's April 2023 termination of the Investment Agreement gives rise to an inference of scienter. True, on March 6, 2023, Lordstown, Hightower, and Kroll stated that Lordstown had "expanded and strengthened [its] partnership with Foxconn"; that Lordstown and Foxconn "continue[d] to work collaboratively"; and that Lordstown and Foxconn "advanced [their] long-term vehicle development partnership"—yet Foxconn terminated the partnership about seven weeks later. In those same March 2023 statements, however, defendants also explained how Foxconn had agreed to invest an additional $70 million into the

partnership upon the transition from the joint venture to the Investment Agreement. Agreeing to such a substantial investment and continuing to commit to producing electric vehicles with Lordstown does not indicate that Foxconn would back out of the partnership weeks later. Plaintiffs have not pleaded facts suggesting otherwise, let alone a strong inference of scienter.

And even if the temporal-proximity factor weighed in plaintiffs' favor, "[p]roximity alone . . . does not support a strong inference of scienter." *Konkol*, 590 F.3d at 401. That is, plaintiffs needed to allege additional "specific facts" establishing that defendants "knew or recklessly disregarded the falsity of statements" for proximity to make a difference in the scienter analysis. *See id.* As explained, plaintiffs have not done so. Thus, this *Helwig* factor also does not support scienter.

For these reasons, plaintiffs have failed to plausibly plead with particularity that defendants acted with scienter when publicly speaking about the partnership.

C.

Because plaintiffs failed to plausibly plead that defendants made materially false or misleading misrepresentations or omissions and that defendants acted with scienter, the district court properly dismissed plaintiffs' Section 10(b) and Rule 10b–5 claim.

V.

The operative complaint also alleges a Section 20(a) controlling-person claim, in violation of 15 U.S.C. § 78t(a). This section of the Exchange Act derivatively holds liable "[e]very person who, directly or indirectly, controls" another person or entity who was held liable for violating any provision of the Exchange Act. *Id.*; *see also Ind. State Dist.*, 583 F.3d at 947 ("When a primary violation of securities law is shown, [Section 20(a)] imposes joint and several liability on 'controlling persons.'"). Liability under this provision rises and falls with the success of plaintiffs'

underlying securities-fraud claims. *See Ind. State Dist.*, 583 F.3d at 947; *see also Frank*, 646 F.3d at 962 ("Section 20(a) claims are predicated upon at least one underlying violation committed by a controlled party.").

Because the district court appropriately dismissed plaintiffs' claim under Section 10(b) and Rule 10b–5, it also properly dismissed plaintiffs' Section 20(a) claim. We therefore affirm the district court's dismissal of plaintiffs' Section 20(a) controlling-person claim.

VI.

Finally, plaintiffs claim that the district court abused its discretion in failing to address (and grant) their perfunctory two-sentence request to amend their amended complaint in their response to defendants' motion to dismiss. *See La. Sch. Emps.' Ret. Sys.*, 622 F.3d at 485 (explaining that "a district court's denial of a motion for leave to amend a complaint generally is governed by an abuse of discretion standard"). Federal Rule of Civil Procedure 15(a) provides that courts "should freely give leave [to amend the complaint] when justice so requires." Fed. R. Civ. P. 15(a). But "in the context of securities litigation," the PSLRA "restricts the scope of Rule 15(a) . . . such that plaintiffs have more limited ability to amend their complaints." *La. Sch. Emps.' Ret. Sys.*, 622 F.3d at 486. And in any event, "a bare request in an opposition to a motion to dismiss—without any indication of the particular grounds on which amendment is sought . . . does not constitute a motion [for leave to amend] within the contemplation of Rule 15(a)." *Id.* (citation omitted). When seeking leave to amend, plaintiffs should instead file a proper motion to amend the complaint— separate from their response to the motion to dismiss—"accompanied [by] a memorandum identifying the proposed amendments" and a proposed amended complaint. *Begala v. PNC Bank, Ohio, Nat'l Ass'n*, 214 F.3d 776, 784 (6th Cir. 2000).

Here, plaintiffs did not appropriately seek leave to amend. In their response to defendants' motion to dismiss, they cursorily asked for leave to amend the operative complaint (an already-amended complaint) if the district court were to grant defendants' motion to dismiss. Even though the district court did not address this request in its opinion granting the motion to dismiss, it did not abuse its discretion. Plaintiffs did not file a proper motion for leave to amend with the proposed amendments; they "were not entitled to an advisory opinion from the [c]ourt informing them of the deficiencies of the complaint and then an opportunity to cure those deficiencies." *See id.* (emphasis removed). "In light of plaintiffs' procedural shortcomings and in the context of the PSLRA," we affirm the district court's effective denial of plaintiffs' request to amend their complaint. *See La. Sch. Emps.' Ret. Sys.*, 622 F.3d at 486.

## VII.

For these reasons, we affirm the district court's judgment.

No. 24-3960, *Lim, et al. v. Hightower, et al.*

**KAREN NELSON MOORE, Circuit Judge, dissenting in part.** I agree with the majority that a great many of the defendants' statements, as alleged, were not materially false or made with the requisite scienter. But, unlike the majority, I would hold that the plaintiffs have stated a claim that defendants Hightower and Kroll made materially false or misleading statements when they disclosed Lordstown's and Foxconn's recision of the Joint Venture and Joint Venture Agreement ("JV" and "JVA") and formation of the Investment Agreement ("IA"), by allegedly failing to disclose that Lordstown had agreed to this change only because it had determined Foxconn was in breach of the JVA and would never perform its obligations. The plaintiffs have plausibly alleged that this omission would have been materially misleading to a reasonable investor, and they have alleged facts that give rise to a strong inference of Hightower's and Kroll's scienter.

## I. THE TRANSITION FROM THE JOINT VENTURE AGREEMENT TO THE INVESTMENT AGREEMENT

The plaintiffs allege that, after Lordstown and Foxconn executed the JVA on May 11, 2022, Foxconn repeatedly "failed to live up to its end of the bargain." R. 31 (Am. Compl. ¶¶ 56, 65) (Page ID #738, 740). Namely, between May and October 2022, Foxconn allegedly:

> (a) failed to grant the Company access to the Model C and Model E vehicle designs that it committed to provide; (b) stalled the Company's attempts to agree on a budget and timeline for the project as contemplated by the JVA; (c) failed to meaningfully engage with the Company during weekly board meetings on the development of a business plan; (d) no-showed meetings and failed to provide approvals on even the most basic items; and (e) otherwise failed to fulfill other agreed upon commitments.

*Id.* ¶ 67 (Page ID #741).

As a result of Foxconn's failures, "it became clear that [Lordstown] would not receive the benefits that Foxconn had promised and was legally required to provide in connection with the

JV." R. 31-3 (Kroll Decl. ¶ 33) (Page ID #1157). After engaging in various attempts to overcome these hurdles, on October 14, 2022, Lordstown allegedly sent a letter to Foxconn asserting that Foxconn was in breach of the JVA, citing the above issues. R. 31 (Am. Compl. ¶ 72) (Page ID #743). "Shortly after receiving the October 14, 2022 letter from Lordstown," the plaintiffs allege, "Foxconn contacted [Lordstown] and expressed its interest in restructuring the joint venture relationship." *Id.* ¶ 76 (Page ID #745). In the plaintiffs' telling, "Foxconn *insist[ed]* that the parties restructure their relationship." *Id.* Header C. (Page ID #745) (capitalization and bolding omitted) (emphasis added). "Since it was clear that Foxconn had no intention of satisfying its commitments in the JV Agreement, [Lordstown] agreed, on November 7, 2022, to pivot away from the JV Agreement and instead Lordstown and [Foxconn] entered into a direct investment agreement." R. 31-3 (Kroll Decl. ¶ 34) (Page ID #1158).

The restructured arrangement, the IA, provided for multiple purchases of Lordstown's common and preferred stocks, respectively, upon the completion of certain milestones. R. 31 (Am. Compl. ¶¶ 77–78) (Page ID #745). If fully performed, the IA would entitle Lordstown to $170 million in investment from Foxconn and partners, $70 million of which could be used for general corporate purposes, and the remainder of which was restricted for use on the electric-vehicle ("EV") program. *Id.* ¶¶ 77–78, 80 (Page ID #745–47). But the parties ultimately closed only the initial purchases contemplated by the IA, amounting to $22.7 million for general corporate purposes, and $30 million restricted to the EV program. *Id*. ¶¶ 77–78, 80, 83 (Page ID #745–47). The remainder of the stock purchases agreed to in the IA were never closed. R. 31-3 (Kroll Decl. ¶ 3) (Page ID #1146). The jettisoned JVA, if performed, would have entitled Lordstown to $100 million in investment from Foxconn, restricted to the EV program. R. 31 (Am. Compl. ¶¶ 56, 71) (Page ID #738, 743).

## II. THE RECORD

The parties dispute whether the district court erred by taking judicial notice of four exhibits attached to the defendants' motion to dismiss. At the motion-to-dismiss stage "courts 'may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein.'" *Hodges v. City of Grand Rapids*, 139 F.4th 495, 510 (6th Cir. 2025) (quoting *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008)); *see also Wyser-Pratte Mgmt. Co. v. Telxon Corp.*, 413 F.3d 553, 560 (6th Cir. 2005) ("In addition to the allegations in the complaint, the court may also consider other materials that are integral to the complaint, are public records, or are otherwise appropriate for the taking of judicial notice."). But restrictions on judicial notice "generally allow[] a court to conclude only that the record exists; the exception does not allow the court to treat all information in the record as true." *Hodges*, 139 F.4th at 512 (quoting *Blackwell v. Nocerini*, 123 F.4th 479, 487 (6th Cir. 2024)).

In securities actions, courts have concluded that "it is highly impractical and inconsistent with Fed.[]R.[]Evid. 201 to preclude a district court from considering [] documents [filed with the SEC] when faced with a motion to dismiss a securities action based on allegations of material misrepresentations or omissions." *Kramer v. Time Warner Inc.*, 937 F.2d 767, 774 (2d Cir. 1991). Often, "the documents are the very documents that are alleged to contain the various misrepresentations or omissions and are relevant not to prove the truth of their contents but only to determine what the documents stated." *Id.* After all, in such actions, as here, the plaintiff must plead that the misrepresentations or omissions would have changed the total mix of information available to the reasonable investor. *Basic, Inc. v. Levinson*, 485 U.S. 224, 231–32 (1988).

"Fairness and efficiency require," therefore, that the court consider the full mix of information that actually was available. *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 466 (6th Cir. 2014). Otherwise, "[w]ere courts to refrain from considering such documents, complaints that quoted only selected and misleading portions of such documents could not be dismissed under Rule 12(b)(6) even though they would be doomed to failure," for example, if the allegedly undisclosed information had, in fact, been available to the public the whole time. *Id.* (quoting *Kramer*, 937 F.2d at 774). "Foreclosing resort to such documents might lead to complaints filed solely to extract nuisance settlements." *Id.* (quoting *Kramer*, 937 F.2d at 774).

The district court was entitled to take judicial notice of documents attached to the defendants' motion to dismiss, so long as those documents went to the totality of information available and so long as the district court took judicial notice *only* of the fact that the information was made public. *Hodges*, 139 F.4th at 512. The district court could not, however, take judicial notice of these documents for their truth. *Id.*

I agree with the majority that the district court did not err by taking judicial notice of Lordstown's 8-K filings, attached to the motion to dismiss as R. 35-4 and R. 35-6, respectively. The district court correctly held that, because "Plaintiffs dispute Defendants' public characterization of the Foxconn partnership," they could not prevent the court from reviewing the full scope of that characterization, making such public statements "relevant in determining whether Defendants misled the public given the totality of available information." R. 40 (Op. and Order at 15–16) (Page ID #1581–82); *see* Majority Op. at 10 (citing cases). But I disagree with the majority that the district court correctly took notice of and relied on R. 35-3 and R. 35-8.

## A. R. 35-3 (Foxconn Statements)

R. 35-3 is a collection of public statements made by Foxconn, not by Lordstown, painting the partnership as a positive collaboration. Arguably, such statements also could constitute part of the total mix of information available to the reasonable investor and, therefore, be relevant to the materiality of the defendants' allegedly false statements. *See Basic*, 485 U.S. at 231–32. But the district court took judicial notice of those statements as relevant for assessing the defendants' *scienter*, not materiality; it wrote that Foxconn's public statements were "relevant in determining whether the Court can infer scienter as to Defendants' optimistic statements," because they "help to reveal the totality of information Foxconn communicated to [Lordstown]." R. 40 (Op. and Order at 15) (Page ID #1581). The district court further noted that Foxconn "referred to [Lordstown] as a 'strategic partner' and characterized the relationship as 'progressing quite smoothly,'" giving the defendants reason to be "hopeful about [the partnership's] success." *Id.* at 26 (Page ID #1592) (citation omitted).

On appeal, the defendants do not argue that Foxconn's public statements were relevant to materiality, and instead assert that "Plaintiffs cannot plausibly claim that Foxconn's public characterization of the [Lordstown] relationship to its own shareholders is irrelevant to Defendants' perception of Foxconn's views of that relationship." Appellees' Br. at 56. The majority similarly states that, because "these documents portray Foxconn's characterization of the partnership, they are plainly relevant to defendants' knowledge of it and thus whether they acted with scienter." Majority Op. at 9. But evaluating the documents for purposes of determining the defendants' scienter requires the court to take judicial notice of more than the mere existence of these documents, which is all the court may do here. *Hodges*, 139 F.4th at 512. The mere existence of these documents does not shed light on whether Foxconn's positive statements about the

partnership were true or, more importantly, whether the defendants believed them. The plaintiffs' allegations explicitly contradict the truth of these statements, and the plaintiffs allege that despite the defendants' *own* public statements to the contrary, they knew the relationship was troubled. R. 31 (Am. Compl. ¶¶ 165–201) (Page ID #794–807). The truth of these statements and the defendants' beliefs as to them may be resolved at a later stage in the litigation, but, for now, taking judicial notice of the existence of these documents has no effect on the scienter analysis, because the court cannot "treat all information in the record as true." *Hodges*, 139 F.4th at 512.

Unlike materiality—which focuses solely on whether the documents were publicly available—taking judicial notice of these documents for purposes of the scienter analysis requires the court to evaluate things beyond the documents' mere existence. Indeed, for its argument about scienter, the majority cites only cases that took notice of publicly available information when it was "appropriate for showing the market was aware of the information contained in" in such documents, i.e., relevant to materiality, or to determine if public statements put the plaintiff on notice that the statute of limitations had run. Majority Op. at 9 (alterations accepted) (quoting *In re Am. Apparel, Inc. S'holder Litig.*, 855 F. Supp. 2d 1043, 1062 (C.D. Cal. 2012)). To take judicial notice of these documents as relevant to scienter, absent an exception, is effectively to consider evidence outside of the pleadings, which is improper on a motion to dismiss. *See Hodges*, 139 F.4th at 511.[1]

---

[1]The defendants' reliance on *Tellabs, Inc. v. Makor Issues & Rts., Ltd.* is misplaced. *See* Appellees' Br. at 56. *Tellabs* stands for the proposition that, in deciding a motion to dismiss a securities action, "[t]he inquiry . . . is whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets that standard." 551 U.S. 308, 322–23 (2007). True, the Court stressed that "courts must consider the complaint in its entirety, as well as . . . documents incorporated into the complaint by reference, and matters of which a court may take judicial notice." *Id.* at 322. But *Tellabs* does not

**B. R. 35-8 (Form 4s)**

R. 35-8 consists of three Form 4s filed with the SEC to report stock transactions made by defendants Hightower and Kroll. The district court took judicial notice of these documents because it found that they contradicted the plaintiffs' scienter allegations. R. 40 (Op. and Order at 16–17) (Page ID #1582–83). The Form 4s are proper subjects of judicial notice as public SEC documents. *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d at 466.[2] The district court, however, again erroneously took notice of the truth of the contents of these documents, that is, to determine the actual, rather than reported, nature of the stock transactions. The district court found that two of the Form 4s, instead of reporting suspicious purported sales by Hightower and Kroll, "explicitly state restricted stock units were converted into common stock in [Lordstown] to satisfy certain tax withholding obligations and were not sold by Kroll and Hightower as Plaintiffs claim." R. 40 (Op. and Order at 36) (Page ID #1602). The district court also accepted as true that Hightower purchased 10,000 shares of Lordstown stock during the class period, as reflected in the third Form 4. *Id.* The district court went on to conclude that, for those reasons, the plaintiffs' allegation that Hightower and Kroll "sold stock because of a failing relationship with Foxconn lacks factual support and subsist[s] only on Plaintiffs' conclusory speculation." *Id.* The court "[t]herefore . . . f[ound] no suspicious insider trading activity supporting an inference of scienter." *Id.*

It is true that two of the Form 4s reported "[d]ispos[al]" of non-derivative securities was accompanied by a footnote indicating that the transaction "[r]epresents shares withheld by the

---

create entirely new grounds on which a court may take judicial notice of documents not otherwise amenable to such treatment.

[2]The majority states that the complaint incorporated the Form 4s by reference. Only two of the three forms, however, were cited in the complaint and may be considered incorporated by reference. R. 31 (Am. Compl. ¶¶ 178, 180) (Page ID #799–800).

Issuer to satisfy the Reporting Person's tax withholding obligation upon the settlement of previously reported restricted stock units . . . [and] does not represent a sale by the Reporting Person." R. 35-8 (Form 4s) (Page ID #1351–52). It is likewise true that the third Form 4 reported that Hightower purchased Lordstown stock during the class period. *Id.* (Page ID #1350). But even if the district court's interpretation of the Form 4s was accurate, the district court still improperly relied on the truth of their contents. The district court was entitled to find only that the Form 4s did not on their face *report* any suspicious insider training. *Hodges*, 139 F.4th at 512. Therefore, the district court accepting the contents of the Form 4s as true and contradicting the plaintiffs' allegations was improper.

### III. MATERIALLY FALSE OR MISLEADING

The parties dispute whether the defendants' statements, as alleged, were false or misleading. The plaintiffs allege that on November 7 and 8, 2022, Lordstown, as an entity and through defendants Ninivaggi, Hightower, and Kroll, made materially false or misleading statements when describing the execution of the IA with Foxconn. R. 31 (Am. Compl. ¶¶ 114–19) (Page ID #760–67). In pertinent part, Lordstown's statements asserted that "Foxconn's additional investment in [Lordstown] is a strong sign of confidence in our team's capabilities," and stated that the IA's "direct investment in Lordstown is a better, simpler, easier structure" than the JV, and was "very favorable." *Id.* ¶¶ 117–18 (Page ID #763–65).

The plaintiffs' allegation that these statements were materially false or misleading is best construed as a claim of selective or incomplete disclosure. Generally, there is no affirmative duty to disclose "soft" information, like opinions and predictions, unless it is "virtually as certain as hard facts." *Zaluski v. United Am. Healthcare Corp.*, 527 F.3d 564, 572 (6th Cir. 2008) (quoting *City of Monroe Emps. Ret. Sys. v. Bridgestone Corp.*, 399 F.3d 651, 669 (6th Cir. 2005)).

But, "once a company chooses to speak, it must 'provide complete and non-misleading information with respect to subjects on which [it] undertakes to speak.'" *Id.* (alteration in *Zaluski*) (quoting *Rubin v. Schottenstein, Zox & Dunn*, 143 F.3d 263, 268 (6th Cir. 1998)). This is true whether the information is hard or soft. *See id.* ("[T]he question thus is not whether a [company's] silence can give rise to liability, but whether liability may flow from [its] decision to speak . . . concerning material details . . . , without revealing certain additional known facts necessary to make [its] statements not misleading." (first alteration added) (quoting *Rubin*, 143 F.3d at 267)). Here, the defendants are not accused of merely failing to disclose information. Instead, the plaintiffs allege that the above statements about the IA were materially false or misleading because the defendants made statements about the Foxconn relationship[3] while also "failing to disclose . . . facts [about that relationship] that would have been highly material to investors." R. 31 (Am. Compl. ¶ 119) (Page ID #765).

---

[3]The defendants point to an unpublished per curiam order—in which we summarily adopted a district court's analysis—for the proposition that the defendants had no duty to disclose the content of contract negotiations until the outcome became certain. *See* Appellees' Br. at 31; Oral Arg. at 15:45–17:10; *Freeburg v. Wolf*, 42 F. App'x 715, 715 (6th Cir. 2002). But, as relevant to the defendants' disclosures about the transition from the JV to the IA, the defendants here are not accused of having failed to disclose the content of ongoing contract negotiations before the conclusion of those negotiations. Instead, the plaintiffs allege that, when the defendants undertook to disclose the *outcome* of contract negotiations after their conclusion, they did so in a way that left out material information and rendered the already-disclosed information false or misleading. Comparing *Freeburg* to this case is comparing apples to oranges. For the same reason, the defendants' reliance on the Second Circuit's unpublished decision in *Express Scripts* is unavailing. *In re Express Scripts Holdings Co. Secs. Litig.*, 773 F. App'x 9, 13–14 (2d Cir. 2019). There, too, the defendant was accused of failing to disclose affirmatively the poor tenor of negotiations before the parties reached a resolution. *Id.* *Freeburg* and *Express Scripts* are plainly inapposite; even if, as counsel for the defendants asserted at oral argument, these two nonbinding cases do establish a "bright-line rule" for when a duty to disclose arises, Oral Arg. at 15:45–17:10, the instant case is firmly on the actionable side of that hypothetical line—when the alleged misstatements were made, contract negotiations had concluded with the execution of the IA and the defendants had chosen to speak affirmatively about that result. *See Zaluski*, 527 F.3d at 572.

Although Kroll qualified his public statements about the IA by saying "*[w]e kind of think* the direct investment in Lordstown is a better, simpler, easier structure[,] [s]o *I think* it's very favorable," *id.* ¶ 118 (Page ID #764–65) (emphasis added), even an opinion can be "specific enough to form the basis of an actionable securities fraud claim," *City of Monroe*, 399 F.3d at 674. "[O]pinions about a verifiable assertion 'contain at least three implicit factual assertions: (1) that the statement is genuinely believed, (2) that there is a reasonable basis for belief, and (3) that the speaker is not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement.'" *Id.* at 675 (quoting *Helwig v. Vencor, Inc.*, 251 F.3d 540, 557 (6th Cir. 2001) (en banc)). For that reason, "once [a] company cho[o]se[s] to speak regarding an objective fact," even if expressing an opinion about that fact, the company is "'required to qualify that representation with known information undermining (or seemingly undermining) the claim.'" *Zaluski*, 527 F.3d at 576 (quoting *City of Monroe*, 399 F.3d at 673).

A reasonable trier of fact could find misleading Lordstown's implicit statement that it was "not aware of any undisclosed facts tending to seriously undermine the accuracy of the statement" that the IA was better, simpler, easier, and favorable compared to the JV and that it represented a strong showing of Foxconn's confidence in Lordstown. *City of Monroe*, 399 F.3d at 675 (quoting *Helwig*, 251 F.3d at 557). Such descriptions of the agreement convey verifiable assertions—one can objectively verify if an agreement is simpler, easier, or more favorable than the prior one by evaluating the terms of the agreements. One can likewise objectively verify the state of the relationship between Foxconn and Lordstown by evaluating their interactions and communications. Construing the complaint and its exhibits in the plaintiffs' favor, Lordstown had entered into the IA only after concluding that Foxconn had breached the JVA and only when "it became clear that [Lordstown] would not receive the benefits that Foxconn had promised and was

legally required to provide in connection with the JV." R. 31-3 (Kroll Decl. ¶ 33) (Page ID #1157).[4] This omitted context undermines the assertion that the IA was better than the JV and that it represented a positive development in the parties' relationship, which in turn renders false and misleading what the defendants allegedly did say. *See City of Monroe*, 399 F.3d at 675.[5]

The defendants' failure to disclose facts undermining their description of the IA was material. Would a reasonable investor have viewed the omitted information—that Foxconn had

---

[4]The district court held and the defendants argue that information drawn from the adversary proceeding that Lordstown filed against Foxconn in bankruptcy court cannot support the plaintiffs' claims because "[a]llegations made in light of Foxconn's repudiation *after* the fact do not establish Defendants' beliefs or knowledge about the partnership *before* it disbanded." R. 40 (Op. and Order at 33–34) (Page ID #1599–1600). True to an extent, but there is abundant information in the adversary complaint and its exhibits that speaks not to the conclusions Lordstown drew after Foxconn's final repudiation (i.e., that, from the outset, Foxconn's intent was to force Lordstown into bankruptcy), but instead speaks to the events as they transpired at the time and the defendants' contemporaneous conclusions about them. *See, e.g.*, R. 31-3 (Kroll Decl. ¶ 26) (Page ID #1155) ("In April 2022, . . . [t]he Company was understandably concerned because Foxconn had done nothing to further the joint venture since the APA was signed. The Company's concerns would only get worse."). It is therefore proper to consider the adversary complaint and bankruptcy filings, which were attached to the complaint and incorporated by reference, as allegations relating to the defendants' then-existing knowledge.

[5]The defendants argue that their statements were not false or misleading because the IA was in fact better than the JV. Oral Arg. at 17:40–20:30. That is beside the point. The plaintiffs do not argue that defendants' statements were misleading as to the actual terms of the IA. The crux of the plaintiffs' claims is instead that, "[d]espite the numerous serious, and potentially disastrous, issues with the Foxconn relationship, . . . Lordstown and Defendants continuously misrepresented to investors that the Company's *relationship with Foxconn was thriving*." R. 31 (Am. Compl. ¶ 111) (Page ID #756) (emphasis added). The complaint plausibly pleads that— even if everything the defendants said about the terms agreed to in the IA was completely true— the defendants' failure to disclose that Foxconn's breaches of the JV (as they were contemporaneously characterized by Lordstown) precipitated the IA was misleading as to the status of the partnership. This is sufficient to proceed on a theory of selective or partial disclosure. *Zaluski*, 527 F.3d at 576. Any assertion that the defendants' statements could not have been false because the IA was in fact better than the JV attacks a strawman in the place of the plaintiffs' actual arguments.

breached the agreement that the IA replaced and that Lordstown entered into the IA only when it became clear that Foxconn would never perform on the JVA—"as having significantly altered the 'total mix' of information made available" about the Foxconn/Lordstown relationship and its impact on Lordstown's prospects? *Basic*, 485 U.S. at 231–32 (citation omitted). I think yes. Lordstown painted the IA as "a strong sign of confidence in our team's capabilities" and "favorable," R. 31 (Am. Compl. ¶¶ 118) (Page ID #764–65), but, if the plaintiffs' allegations are true, it was in fact a concession by Lordstown after Foxconn revealed itself to be in total breach of the previous agreement, R. 31-3 (Kroll Decl. ¶ 33) (Page ID #1157–58). That allegedly omitted information would represent a significant alteration in the total mix of information available, *Basic*, 485 U.S. at 231–32, and a reasonable trier of fact could find that Lordstown's statements were therefore materially false or misleading.[6]

The defendants' assertion that the circumstances surrounding Foxconn's breach of the JVA could not possibly have been material because the JV was ultimately replaced by something better, Oral Arg. at 13:10–14:20, ignores the fact that the underlying dynamics of the relationships would remain material because of what they meant for the success of the IA and overall partnership. After all, just as Foxconn breached the JVA before the IA was formed, Foxconn went on to breach the IA itself less than six months after it was executed. R. 31-1 (Adversary Compl. ¶¶ 61–62) (Page ID #850–51). This is not to say that the defendants knew or should have known that Foxconn

---

[6]Contrary to the district court's and the defendants' implication, the plaintiffs need not show that the defendants' statements were misleading about the ultimate results of the Lordstown/Foxconn relationship. *See, e.g.*, Appellees' Br. at 2; R. 40 (Op. and Order at 37) (Page ID #1603). The plaintiffs' claims, as alleged, do not hinge on such a showing. It is enough that the defendants made materially misleading statements about the then-current condition of that relationship. Perhaps each incremental breach of the JVA did not individually make Lordstown's later statements about the IA misleading, but the fact that Lordstown independently concluded that Foxconn had breached and told the latter as much, plausibly does.

would breach the IA. It does, however, demonstrate that the mere formation of the IA could not render immaterial the troubled nature of the Foxconn and Lordstown relationship, the ultimate collapse of which caused material harm to the company in fairly short order.

## IV. SCIENTER

The plaintiffs have pleaded factual allegations giving rise to a strong inference that at least defendants Kroll and Hightower[7] acted recklessly with regard to the veracity of their positive statements about the formation of the IA and attendant relationship with Foxconn. The district court, the defendants, and the majority rest their scienter analyses almost entirely on the *Helwig* factors. As explained below, those analyses have their flaws. But it is first important to note that the *Helwig* factors are not exhaustive. The en banc court in *Helwig* "point[ed] to fixed constellations of facts that courts *have found* probative of securities fraud" and relevant to scienter, "[l]est parties be adrift in a sea of allegations." *Helwig*, 251 F.3d at 552 (emphasis added). The court explicitly stated, however, that the list of factors was "not exhaustive," but was "helpful in guiding securities fraud pleading." *Id.* And, of course, the Supreme Court has since made clear that courts should ask "whether *all* of the facts alleged, taken collectively, give rise to a strong inference of scienter, not whether any individual allegation, scrutinized in isolation, meets the standard." *Tellabs*, 551 U.S. at 322–23.

In this case, there are important facts probative of the defendants' state of mind that are not encompassed by the *Helwig* factors, namely, the allegations in the bankruptcy adversary complaint

---

[7]The amended complaint alleges statements *by* defendant Ninivaggi, but does not state facts supporting the inference that Ninivaggi specifically (rather than the defendants collectively) knew about the circumstances surrounding Foxconn's breach of the JV and the formation of the IA. As detailed below, there are allegations supporting the inference that Hightower and Kroll, personally and specifically, knew of these facts. I therefore conclude that the plaintiffs have not stated a claim as to Ninivaggi's scienter.

and related documents, as incorporated by the amended complaint in this case. As stated above, *see* n.4, that information is relevant only insofar as it constitutes circumstantial evidence of what the defendants knew or believed at the time the JVA was breached and the IA was executed.

The adversary complaint provides chronological explanations and contemporaneous descriptions of the events leading to Lordstown's bankruptcy. It alleges that, at the time, "[t]he JV was essential," that Foxconn "stymied" Lordstown's "attempts to move forward with the partnership to develop future Lordstown vehicles under the JV Agreement," "dragged its feet in working to develop the parties' agreed upon joint development platform," "lack[ed]" or "refused" engagement in critical JV operations, and that it "stonewalled [Lordstown's] efforts regarding the JV at each and every turn." R. 31-1 (Adversary Compl. ¶¶ 30, 32, 37–38, 40, 42, 135) (Page ID #838, 841–44, 865). These descriptions are situated in time, and the plaintiffs' amended complaint in this case alleges that the defendants were contemporaneously aware of Foxconn's breach. *See, e.g.*, R. 31 (Am. Compl. ¶¶ 165–201) (Page ID #794–807); *City of Monroe*, 399 F.3d at 672–73.[8]

---

[8]*See, e.g.*, R. 31 (Am. Compl. ¶ 165) (Page ID #794) ("Foxconn's partnership was so critical to Lordstown's success during the Class Period that the misrepresented and omitted information at issue would have been readily apparent to all Defendants"); *id.* ¶ 171 (Page ID #796) ("Hightower and Kroll routinely discussed Lordstown's relationship with Foxconn, thus indicating that they were aware of the terms of the agreements, including the JVA, about which they spoke"); *id.* ¶ 174 (Page ID #797) ("Defendants were aware that Foxconn had breached the JVA and the Investment Agreement because they were intimately involved with the relationship between the two parties. From the onset of the partnership, Defendants each promoted the close working relationship between Lordstown and Foxconn to successfully complete each phase of the partnership."); *id.* ¶ 175 (Page ID #798) ("As purported evidence of the promotion of these goals, Hightower stated, at the President's Speaker Series at Bentley University on November 14, 2022, '*we are in constant communication with the chairman of Foxconn*.'" (citation omitted)); *id.* ¶ 178 (Page ID #798) (alleging the defendants participated in "*weekly* board meetings" with Foxconn); *id.* ¶ 181 (Page ID #800) ("Hightower's and Kroll's statements regarding Lordstown's relationship with Foxconn indicated that they were actively involved in working with Foxconn and thus would have been aware of Foxconn's 'extreme bad faith' in dealing with Lordstown." (citation omitted)); *id.* ¶ 182 (Page ID #800) (noting Hightower's statement that he served as CEO of the JV); *id.* ¶ 190 (Page ID #802) ("Based on [Hightower's] statements displaying intimate knowledge of the progress of Endurance production . . . he would have been aware of Foxconn's

The adversary complaint explains why Lordstown sent the breach letter when it did—by October 2022, Foxconn's failure to "provide data and information for the Model C and Model E designs as required by the JV Agreement" "result[ed]" in Lordstown having to "defer promising discussions with one of the largest fleet managers in North America, which subsequently made large electric vehicle purchases from other manufacturers." R. 31-1 (Adversary Compl. ¶ 41) (Page ID #844). And the adversary complaint explicitly attributes Lordstown's decision to sign the IA to Foxconn's "fail[ure] to live up to its commitments in the JV" and alleges that Foxconn "convinced" Lordstown to terminate the JV and enter the IA. *Id.* ¶¶ 44, 47 (Page ID #845–46).

The bankruptcy filings, as incorporated into the amended complaint, also include statements from some of the defendants themselves. In his declaration in support of Lordstown's bankruptcy litigation, defendant Kroll avers that, as early April 2022, Lordstown "was understandably concerned because Foxconn had done nothing to further the joint venture" since it acquired the plant, and stated that Lordstown's "concerns would only get worse" from that time onward. R. 31-3 (Kroll Decl. ¶ 26) (Page ID #1155). Foxconn's failure to "follow[] through on its commitments" in the JVA had already "materially damaged [Lordstown] and [its] business prospects." *Id.* ¶ 29 (Page ID #1155–56). Kroll describes the company's understanding during the summer of 2022, asserting that, "[a]s a result of [Foxconn's] failures, it *became* clear that [Lordstown] would not receive the benefits that Foxconn had promised and was legally required

---

repeated efforts to stagnate progress."); *id.* ¶ 200 (Page ID #806) ("Every quarter during the Class Period, Hightower and Kroll presented the operational updates and balance sheets for Lordstown on presentation slides. Kroll provided these updates with Hightower present which meant that Kroll was frequently apprising himself of Lordstown's financial position while apprising Hightower, at the very least, during these meetings."); *id.* ¶ 201 (Page ID #807) ("Kroll made numerous detailed statements that he had extensive knowledge about Lordstown's financial position, and the amount of cash Lordstown had on hand during the Class Period.").

to provide in connection with the JV." *Id.* ¶ 33 (Page ID #1157–58) (emphasis added). Importantly, Kroll states that, by the fall of 2022, "[s]ince it *was* clear that Foxconn *had* no intention of satisfying its commitments in the JV agreement," the company agreed to terminate the JVA and execute the IA. *Id.* ¶ 34 (Page ID #1158) (emphasis added). Hightower likewise submitted a declaration that detailed his personal knowledge of, and involvement in, the relationship between Foxconn and Lordstown. R. 31-2 (Hightower Decl. ¶¶ 5, 8–13) (Page ID #1139–42). Of course, the defendants' later descriptions of those events in bankruptcy court is not conclusive as to what they thought or knew at the time, but they are allegations we must accept as true at the motion-to-dismiss stage.

The plaintiffs have also alleged that during the class period, Lordstown's entire business model "relied on deep collaboration with Foxconn." R. 31-2 (Hightower Decl. ¶ 10) (Page ID #1141); *accord* R. 31 (Am. Compl. ¶ 204) (Page ID #808) ("Lordstown repeatedly touted its new business model, a strategic partnership [with Foxconn], which Lordstown claimed reduced its operating costs and increased its productivity."); R. 31-1 (Adversary Compl. ¶ 3) (Page ID #831) ("[Lordstown] materially and permanently changed [its] entire business model to support deep integration with Foxconn.").

In sum, given Kroll's and Hightower's positions as high level executives who "can be presumed to be aware of matters central to their business's operation," *PR Diamonds, Inc. v. Chandler*, 364 F.3d 671, 688 (6th Cir. 2004), coupled with the allegations that they were intimately involved with the JV and knew of significant issues with the Foxconn/Lordstown relationship, which was undisputedly critical to Lordstown's continued viability, and the allegations of insider trading and self-interest discussed below, the court can infer that Kroll and Hightower knew of Foxconn's breaches of the JVA and its subsequent effect on the IA.

To the extent the district court and the defendants characterize the IA as a seemingly positive development in the parties' relationship or better than the JV in substance—*see e.g.*, Oral Arg. at 12:15–12:30 (counsel for the defendants calling the IA a "positive evolution from Lordstown's perspective"); Appellees' Br. at 10, 32–34 ("In response to [Lordstown's October 2022 breach] letter, Foxconn appeared to double down on its commitment to the partnership"); R. 40 (Op. and Order at 26) (Page ID #1592) (asserting that the plaintiffs "do[] not dispute that Foxconn tripled its investment in [Lordstown] under the IA, as amended, vouched for LMC with Softbank, moved the Endurance into production despite the delays, referred to [Lordstown] as a 'strategic partner' and characterized the relationship as 'progressing quite smoothly'" (quoting R. 35-3 (Inv. Conf. Tr. at 8, 10) (Page ID #1265, 1267) (citation omitted))—they ignore the plaintiffs' theory of liability and fail to construe the facts in the light most favorable to the plaintiffs. Similarly, the majority construes the facts against the plaintiffs when it asserts that "[t]he parties' decision to distance themselves from the fruitless joint venture was not so much a 'red flag' that defendants ignored but rather an attempt to keep the partnership moving forward." Majority Op. at 25. That is the defendants' version of the facts, at least in this litigation.[9]

As the district court acknowledged, the plaintiffs' theory is that "the companies entered into [the IA] [] because Foxconn 'forced' [Lordstown] to renegotiate through their failure to provide the Model C and Model E vehicle designs and 'constant bad faith conduct.'" R. 40 (Op. and Order at 24) (Page ID #1590) (quoting R. 31 (Am. Compl. ¶¶ 72, 76–77) (Page ID #743, 45),

---

[9]Meanwhile, the way the defendants describe the events in the bankruptcy litigation aligns much more closely with the plaintiffs' position that the IA was a concession forced by Foxconn's breaches of the JV. R. 31-1 (Adversary Compl. ¶¶ 44, 47) (Page ID #845–46). The defendants should not be allowed to characterize the IA one way in this litigation and another in bankruptcy court, just because it benefits them to do so.

R. 36 (Opp. to Mot. to Dismiss at 10) (Page ID #1494)). The issue then, from the plaintiffs' perspective, is not that the defendants misrepresented the actual content of the JVA or the IA, but that they materially misrepresented the agreements' portent for the status of the Foxconn/Lordstown relationship. *See* R. 31 (Am. Compl. ¶ 111) (Page ID #756). Contrary to the defendants' assertion, Oral Arg. at 18:00–18:30, the plaintiffs therefore must neither prove nor allege that the IA was in fact worse than the JV.

Ultimately, a jury may find that the plaintiffs' theory—that the defendants knew and concealed that the IA was a concession in the relationship, not a positive development—is less credible than the defendants' theory that, from Lordstown's perspective at the time, Foxconn and Lordstown "overcame the[] hurdles" of Foxconn's JVA breach, that the IA represented a larger, more flexible agreement with Foxconn, and that they did not understand its true implications until after the fact. *See* Appellees' Br. at 35–37, 53. But, at the pleading stage it is not our role to decide between the two competing pictures painted by the parties, so long as the inference of scienter raised by the plaintiffs' complaint is "at least as compelling as any opposing inference one could draw from the facts alleged." *Tellabs*, 551 U.S. at 324. We otherwise must take the plaintiffs' allegations as true, draw inferences in their favor, and determine whether they have pleaded a plausible claim with specificity. *See City of Monroe*, 399 F.3d at 672–73.[10] For the reasons stated herein, the plaintiffs have done so.

---

[10]The district court erred when it stated that "Plaintiffs cannot rely on the problems and ignore the benefits in the partnership to prove Defendants' general, optimistic statements are inconsistent with the actual 'state of affairs' between the companies." R. 40 (Op. and Order at 26) (Page ID #1592). Unless, even when construing the facts in the plaintiffs' favor, their allegations about the partnership are rendered implausible by its total character *as alleged in the complaint*, this court may not accept as true the defendants' gloss on the facts. *See City of Monroe*, 399 F.3d at 672–73.

Additionally, certain of the *Helwig* factors and associated principles support a strong inference of scienter, or at least do not undermine that inference in the ways suggested by the district court, the defendants, and the majority.

## A.  Suspicious Insider Training

In the course of assessing the first *Helwig* factor—insider trading at a suspicious time or in an unusual amount—the district court relied on the judicially noticed Form 4s, which showed stock transactions dated right before the breach letter (Kroll) and right after the IA was executed (Hightower), and that Hightower purchased additional Lordstown stock.  *See* R. 35-8 (Form 4s) (Page ID #1350–52).  In doing so, the district court improperly took judicial notice of the truth of the facts contained in the Form 4s, as previously discussed in Section II.B.

The district court found that the Form 4s, instead of reporting suspicious purported sales, "explicitly state restricted stock units were converted into common stock in [Lordstown] to satisfy certain tax withholding obligations and were not sold by Kroll and Hightower as Plaintiffs claim" and showed that Hightower purchased additional stock during the class period.  R. 40 (Op. and Order at 36) (Page ID #1602).  The court therefore concluded that there was no suspicious insider trading activity.  The plaintiffs are correct that the Form 4s could not be used "to show that the transactions listed therein were ***in fact*** made for tax purposes."  Appellants' Br. at 60; *see Hodges*, 139 F.4th at 512.  Yet the district court affirmatively *found* "no suspicious insider trading activity supporting an inference of scienter."  R. 40 (Op. and Order at 36) (Page ID #1602).  It was entitled to find only that the Form 4s did not on their face *report* any suspicious insider training.  *Hodges*, 139 F.4th at 512.  This distinction may seem like semantics, but where the court must conduct a holistic analysis, *Tellabs*, 551 U.S. at 322–23, it matters that the district court overweighted one factor in the analysis, and did so, at the motion-to-dismiss stage, in favor of the *defendants*.

The defendants assert that "courts may use documents incorporated by reference to determine whether a plaintiff has accurately represented the information on which [the court] relies in deciding a motion to dismiss." Appellees' Br. at 54. In the normal course, this is not true.[11] Weighing the accuracy of the plaintiffs' allegations is the domain of the jury. *Cf. Hodges*, 139 F.4th at 509. At most, the court could determine that the Form 4s did not themselves *support* the assertion that the defendants engaged in suspicious insider trading, but it could not rely on the Form 4s to find affirmatively that the defendants did not *engage* in suspicious insider trading. *Id.* at 512.

## B. Internal Reports

The district court noted that the parties disputed the second *Helwig* factor—divergence between internal reports and external statements on the same subject—but failed to analyze it independently. *See* R. 40 (Op. and Order at 35–44) (Page ID #1601–10). I agree with the district court and the majority that the confidential-witness statements alleged in the complaint do not support an inference of scienter under this factor because the statements do not contain any indication that the defendants were aware of the information known to the confidential witnesses.

---

[11]It is the case that "[w]hen a document contradicts allegations in the complaint, rendering them implausible, 'the exhibit trumps the allegations.'" *Nolan v. Detroit Edison Co.*, 991 F.3d 697, 707 (6th Cir. 2021) (quoting *Cates v. Crystal Clear Techs., LLC*, 874 F.3d 530, 536 (6th Cir. 2017)). But that is the case only when the document contradicts a complaint's allegations about the content or effect *of that same document*. *See id.* at 710–11 (considering content of ERISA plan documents attached to complaint in order to determine whether the documents contained information the defendant was accused of unlawfully failing to disclose); *Blackwell*, 123 F.4th at 487 ("As the classic example, a plaintiff who asserts a breach-of-contract claim cannot prohibit a district court from considering the whole contract (including the contract terms that undermine the claimed breach) merely by omitting the contract from the complaint."). If, on a motion to dismiss, a court could consider *any* exhibit that contradicted the complaint's allegations, it would effectively be weighing evidence and thereby evading altogether the purely legal motion-to-dismiss inquiry.

But the plaintiffs also argue that this *Helwig* factor is supported in their favor by allegations that defendants Kroll and Hightower "necessarily had knowledge of Foxconn's conduct and the circumstances surrounding the restructured JVA because, in a letter dated October 14, 2022 . . . Lordstown memorialized Foxconn's 'various breaches' of the JVA." Appellants' Br. at 50 (citation omitted). Accordingly, the argument goes, Hightower's and Kroll's positive statements about the favorability of the IA relative to the JV diverged significantly from internal reports on that subject—namely the letter memorializing Foxconn's breach of the JVA—and so are probative of Hightower's and Kroll's scienter.

There are sufficient allegations to support a strong inference that Kroll and Hightower knew of these reports, as discussed previously, based on their positions in the company and the importance of the relationship between Lordstown and Foxconn, along with the allegations as to their contemporaneous knowledge of the breach and close involvement in the relationship. Indeed, defendant Kroll detailed those breaches in support of the adversary complaint, explicitly grounding his testimony in his personal knowledge. R. 31-3 (Kroll Decl. ¶ 9) (Page ID #1149). And the amended complaint in this litigation is replete with "specific facts [and] circumstances suggestive of [the defendants'] knowledge" of Foxconn's JVA breach and the circumstances leading to the IA. *PR Diamonds*, 364 F.3d at 688; *see also supra* n.8. Those allegations recite various statements by both Kroll and Hightower touting the importance of the Foxconn partnership as evidence that both were intimately involved with the relationship and would have knowledge of its finer points. *See supra* n.8. It seems undisputed that, during the class period, Lordstown's entire business model "relied on deep collaboration with Foxconn." R. 31-2 (Hightower Decl. ¶ 10) (Page ID #1141). The plaintiffs therefore have adequately pleaded that there were internal reports (encapsulated by

the breach letter), of which Hightower and Kroll were or would have been aware, that contradicted their external statements about the JV and IA.

For the same reasons, the plaintiffs have pleaded that there were multiple "red flags," in the form of Foxconn's JVA breaches and insistence on converting to the IA, that would have put Hightower and Kroll on notice that the Foxconn/Lordstown relationship was materially troubled in a way not reflected by their public statements. *See PR Diamonds*, 364 F.3d at 687. All of these allegations support a strong inference of scienter.

## C. Self-Interested Motivation

Finally, the plaintiffs allege facts supporting the final *Helwig* factor—the self-interested motivation of defendants in the form of saving their salaries or jobs. The amended complaint alleges that the defendants were clear, internally and externally, that the Foxconn partnership and the market's confidence in that partnership were critical to Lordstown's viability and, therefore, to the defendants' continued employment. *See* R. 31 (Am. Compl. ¶ 209) (Page ID #810) ("Defendants portrayed the relationship between Lordstown and Foxconn in an extremely positive light to attract other investors, which would be necessary for its continued operations."); R. 31-2 (Hightower Decl. ¶ 10) (Page ID #1141) ("To attract new partners and financing prepetition, [Lordstown] needed to demonstrate what it genuinely believed[12] to be the strength and value of the Foxconn partnership—in particular support on the Endurance and, even more importantly, the first new jointly developed vehicle platform."). These concerns about the importance of the partnership were borne out; when the Foxconn relationship publicly and finally unraveled, the

---

[12]Even if the defendants genuinely believed that the Foxconn partnership was strong and valuable, a jury still could find that they were reckless in so believing and therefore had the requisite scienter.

negative impact on Lordstown was severe and immediate. *See* R. 31-1 (Adversary Compl. ¶ 63) (Page ID #851); R. 31 (Am. Compl. ¶¶ 143–44, 148, 152–55) (Page ID #789–92). Despite remedial action, Lordstown declared bankruptcy not two months after news of its rupture with Foxconn became public. R. 31-1 (Adversary Compl. ¶¶ 63, 79) (Page ID #851, 856); R. 31 (Am. Compl. ¶¶ 143, 154) (Page ID #789, 792). The defendants had good reason to fear that, should Lordstown's troubles with Foxconn become public, their livelihoods would be endangered.

\* \* \*

Taken together, the allegations that Lordstown and its executives (including defendants Kroll and Hightower) were contemporaneously aware of and concerned about Foxconn's breaches of the JVA and agreed to the IA only because of those breaches—as supported by the bankruptcy allegations, as well as Hightower's and Kroll's deep involvement with and knowledge of the Foxconn relationship—raise a strong inference that Hightower and Kroll acted at least recklessly when publicly characterizing the execution of the IA and its favorability relative to the JV.

## V. CONCLUSION

For the above reasons, the plaintiffs have stated a claim that Hightower and Kroll made materially false or misleading statements about the transition from the JV to the IA with the requisite scienter. I would therefore **REVERSE** as to these allegations, and **AFFIRM** the district court as to the remainder.